**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal Case No 1:06-cr-00249-PLF/JMF |
| ) | |
| MICHAEL JOHN O'KEEFE, SR. and ) | |
| SUNIL AGRAWAL, ) | |
| ) | |
| Defendants. ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS**

The government's opposition ("Opposition") presents five main arguments in response to defendants' motion to dismiss. *First*, the government argues the Court-ordered discovery is not relevant, let alone *Brady*. Gov't Opp. at 7-15. *Second*, the government argues that even if relevant and that responsive documents were destroyed, "Defendants' due process rights have not been violated." *Id*. at 16, 15-18. *Third*, the government argues that there is no evidence that the government acted in bad faith when it destroyed documents responsive to the Court's order. *Id*. at 18-24. *Fourth*, the government continues to argue that it "sufficiently" performed its discovery obligations—despite the indisputable record to the contrary. *Id*. at 31, 24-31. *Fifth*, the government argues that, even if relevant and exculpatory documents were destroyed, the Court should decline to dismiss the indictment. Defendants briefly respond to each of these arguments below.

**ARGUMENT**

At least since the Arthur Andersen prosecution, *see United States* v. *Arthur Andersen*, 374 F.3d 281 (5th Cir. 2004), the United States has been both vocal and vigorous in its insistence that citizens who are subject to grand jury subpoenas or other investigative demands

undertake rigorous, time-consuming and costly efforts to preserve, locate, and produce every scrap of potentially responsive paper and electronic information. The Department of Justice even issues detailed guidance regarding how electronic documents should be searched and the electronic format in which they should be preserved and produced. Given the range of high profile federal obstruction charges that have been pursued in recent years,[1] there is no question that if a citizen had responded to a grand jury subpoena (or any other government investigation) in precisely the same manner that the United States responded to the Court's orders, that the citizen would be facing the threat, if not the actuality, of charges under 18 U.S.C. §§ 1509 & 1519. The United States' basic position on defendants' motion is that conduct considered criminal if engaged in by a citizen is not even objectionable when engaged in by the government. For reasons set forth below, that is wrong as a matter of law.

1.  **The Documents in Question Were *Brady* Material**

The government has had notice that the requested discovery was relevant and material to the defense since at least December 2006 when defendants made their first discovery request. Multiple Court orders have confirmed the relevance and materiality of the requested documents.[2] Thus, the argument that it takes "20/20 hindsight" (Gov't Opp. at 19) to perceive that the documents should have been preserved and produced is specious. Despite the late date, the government continues to insist that the Court's prior orders are erroneous in order to justify its failure to engage in a meaningful search for electronic documents. This attitude of continued resistance has resulted in the loss of exculpatory material and irreparably prejudiced defendants'

---

[1] *United States* v. *Quattrone*, 4441 F.3d 153, 165-67 (2d Cir. 2006) (charging defendant with obstruction of justice based on a vague email advising employees to follow Credit Suisse First Boston Corporation's document retention procedures and clean up their files before the holidays).

[2] *See United States* v. *O'Keefe*, 2007 WL 1239204 at *3 (D.D.C. April 27, 2007) ("April 27 Order"); Hr'g Tr. at 20-21 (Sept 12, 2007) [Docket No. 79 n.1]; *United States* v. *O'Keefe*, 509 F. Supp. 2d 33, 36-37 (D.D.C. 2007); *United States* v. *O'Keefe*, 521 F. Supp. 2d 59, 61 (D.D.C. 2007).

ability to "present a complete defense" and receive a fair trial. *See California* v. *Trombetta*, 467 U.S. 479, 485 (1984).

The argument that the documents are not *Brady* material is no stronger than the argument that the documents are not relevant. The government asserts that the discovery ordered by the Court is not *Brady* material because it would not make "defendants' conduct … less culpable," Gov't Opp. at 8, "would never negate the element of Defendants' corrupt intent," *id*. at 11, "would [not] negate the "official act" element, *id*. at 13, and "do[es] not exonerate the defendants," *id,* and "would [not] constitute proper impeachment material, *id*. at 14.

Those arguments, on their face, cannot be reconciled with the law of this case, as reflected in multiple orders of this Court. *See United States* v. *O'Keefe*, 2007 WL 1239204 at *3 (D.D.C. April 27, 2007) ("April 27 Order"); Hr'g Tr. at 20-21 (Sept 12, 2007) [Docket No. 79 n.1]; *United States* v. *O'Keefe*, 509 F. Supp. 2d 33, 36-37 (D.D.C. 2007); *United States* v. *O'Keefe*, 521 F. Supp. 2d 59, 61 (D.D.C. 2007). In granting a discovery motion directed at the very same issues, the Court held that defendants had made a "showing, beyond unsubstantiated speculation, that the evidence exculpates the defendant[s]." *O'Keefe*, 509 F. Supp. 2d at 35-37 (internal citations omitted); *see also O'Keefe*, 521 F. Supp. 2d at 62-63 (same as to documentary discovery).

The documents that were located and produced completely undermined the government's original theory of the case—*i.e.*, that the expedited visa *appointments* granted by Mr. O'Keefe were somehow contrary to State Department policy or "written" appointment procedures. Given the expanded—and elusive—theory of bribery set forth in the Superseding Indictment, it is reasonable and non-speculative to conclude that the documents destroyed either would have (1) substantiated the defense that the expedited appointments were substantively routine or (2) impeached the expected testimony of government witnesses that some other aspect

3

of the visa process in this case was inconsistent with "settled practice." *Cf. United States* v. *Birdsall*, 233 U.S. 223, 230-31 (1914).

The more fundamental problem with the government's *Brady* argument is that it presumes that the government already has proven the very elements of the bribery charge which defendants would have attacked with the documents in question (*e.g.*, *quid pro quo* and "official act" elements).[3] Put differently, the government is asking the Court to make a pre-trial determination that the evidence cited in the Indictment and pleadings constitutes evidence of bribery and that, therefore, the evidence that has been destroyed does not matter. That is not the standard that applies to the United States' pre-trial disclosure obligations. *Compare* Gov't Opp. at 16 n.11 *with Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("The government must always produce any *potentially* exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial.") (emphasis added).

2. **Defendants' Due Process Rights Have Been Violated**

The government argues that even if the Toronto consulate failed to preserve and produce documents responsive to the Court's April 27 Order, defendants' due process rights have not been violated because defendants cannot meet the standard announced in *California* v. *Trombetta*, 467 U.S. 479 (1984). *See* Gov't Opp. at 16. In *Trombetta*, the Supreme Court held:

> The constitutional duty … to preserve evidence is limited to evidence that *might be* expected to play a role in the suspect's defense. The evidence

---

[3] In other words, the government's arguments all implicitly assume that the elements of *quid quo pro* and "official act" already have been proven and then argue that the documents would not provide a "defense." These arguments avoid rather than address the fundamental point that the documents in question would be relevant to proving the presence or absence of a *quid pro quo* and "official act." *See, e.g.*, Gov't Opp. at 9-10 ("Defendant Agrawal cannot claim no crime was committed because he foolishly *paid for services* he may have likely gotten for free") (emphasis added); *id.* at 10 ("Nor can Defendant O'Keefe argue that it was legal to *take money for workplace actions* he may have legitimately taken absent any inducement") (emphasis added); *id.* ("the fact that Defendant Agrawal *paid bribes* to Defendant O'Keefe and that Defendant O'Keefe *accepted bribes* … supplies the corrupt intent.") (emphasis added). Underpinning the government's *Brady* arguments—and all the Opposition arguments—is the government's dogged persistence in trying to "define what the defense is." *See* Hr'g Tr. at 18-28 (Sept. 12, 2007).

4

> must possess *an exculpatory value* that was apparent before it was destroyed, and must also be of such a nature that the defendants would be unable to obtain comparable evidence by other reasonably available means.

*Trombetta*, 467 U.S. at 479 (emphasis added).

The record is as follows: Defendants requested the discovery twenty months ago, and made a showing of the exculpatory value at that time. At no time did the government take a single step to preserve responsive material it knew would play a significant role in the defense. *See* Gov't Opp. at 19. That is a far cry from the situation in *Trombetta* where defendants had not requested the evidence before it was destroyed, and the "chances [were] extremely low that the preserved samples would have been exculpatory." *Id*. at 488-89. The document destruction here post-dates the Court's April 27 Order and violated State Department regulations requiring preservation. *See* 5 Foreign Affairs Manual ("FAM") § 476).

More fundamentally, the government's reading of *Trombetta* would make the rights granted in that case meaningless by requiring defendants to prove with certainty that evidence which no longer exists would have been exculpatory. *See* Gov't Opp. at 16 ("Defendants can say no more about the 'exculpatory value' of the allegedly destroyed documents than that they <u>might</u> have been exculpatory."). That is wrong. The "exculpatory value" prong is satisfied where the facts demonstrate there is a sufficient possibility that the evidence "would have been exculpatory." *Trombetta*, 467 U.S. at 489-90; *United States* v. *McKie*, 951 F.2d 399, 423-24 (D.C. Cir. 1991).

In this case, the documents that were produced were so exculpatory that the United States was forced to abandon its original bribery theory and to return a superseding indictment. It is difficult to imagine a clearer pre-trial record of the exculpatory nature of documents. Moreover, this is not a case in which defendants could have done anything more to preserve the evidence in question or obtain the documents by other means.

At bottom, the government's "due process" argument amounts to an assertion that the government may withhold or destroy material evidence "whenever the prosecutors, in their widsom, conclude that it would not make a difference in the outcome of the trial." *Safavian*, 233 F.R.D. at 16. But whether evidence is "cumulative" (see Gov't Opp. at 17) is a question of evidence at trial, not a limitation on the government's disclosure obligations.[4] The United States is not entitled to substitute its judgment of what documents are "important" or exculpatory for the Court's order compelling discovery. *See O'Keefe*, 2007 WL 1239204 at *3 ("The fact that the government has produced the publicly available and otherwise formal policies, and that it intends to offer a witness at trial … hardly satisfies the test").

### 3. The Deliberate Disregard of Court Orders Constitutes Bad Faith

The question before the Court is not whether any single individual acted with bad intent. Rather, the question is whether given the knowledge of the United States as a whole, the United States treated the electronic documents in its exclusive custody and control in a manner that evidences a good faith effort to collect and produce those documents.

The record demonstrates the following: The United States had clear knowledge (through Court orders) of the exculpatory nature of the documents in their possession.[5] The United States failed to take <u>any steps</u> to preserve that evidence. The efforts to locate, collect, and secure the documents were undertaken in a half-hearted, mechanical, and ultimately deficient manner, by individuals who ignored their mandate. The failure to preserve, coupled with the failure to produce, has resulted in the irreparable loss of evidence. Finally, when confronted with

---

[4] The Court already has recognized that different electronic documents, created by different individuals at different times, reflecting different "decisions in specific cases with respect to expediting on individual requests," O'Keefe, 2007 WL 1239204 at *3, are all probative and material.

[5] Indeed, the knowledge factor in this case differentiates it from other destruction cases. *See, e.g.*, *Arizona* v. *Youngblood*, 488 U.S. 51 (negligent failure to preserve happened before any tests were conducted—*i.e.*, the government itself did not have any reason to know whether the evidence would have been inculpatory or exculpatory); *In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996) ("no evidence the police knew of the exculpatory nature of the evidence at the time [it was destroyed]").

6

the gaps and inadequacies in the production, the United States responded with a series of half-truths and misrepresentations about its discovery response. Amazingly, the recent declarations submitted by Ms. Petrovich and Mr. Long in connection with the Opposition still are demonstrably inaccurate. *See infra* Section 5. If this record is evidence of a good faith response to discovery in a criminal case, then it is, with all due respect, difficult to imagine what pattern of conduct would rise to the level of bad faith. *See, e.g.*, *United States* v. *Benlizar*, 459 F. Supp. 614 (D.D.C. 1978).

### 4. The Government Failed to Meet its Discovery Obligations

The belated declarations do not and cannot address the fundamental defects in the government's discovery response to the Court's orders. Defendants can establish by objective evidence that the Toronto consulate's productions do not contain categories of documents that the government has said it has produced. The government's new declarations do not even attempt to explain these gaps or to identify the location of these documents in its productions, thereby confirming that the documents were destroyed. *See United States* v. *Chapman*, 524 F.3d 1073 (9th Cir. 2008) (affirming dismissal of indictment for recklessly managing discovery and misrepresenting its compliance to the court)

To take one example, Ms. Petrovich states that she searched the "shared NIV email folders" and that "[a]ll responsive documents were provided." Petrovich 3d Decl. at ¶ 4 [Docket No. 122, Ex. 4]. But the government's productions contain no emails collected from shared mailbox sources. *See* B. Harrison Supp. Decl. at ¶ 6 (**Ex. 1**).[6] To challenge this

---

[6] An analysis of the 21,197 pages produced by the Toronto consulate also shows that such documents were not produced. In sum, over three-quarters of Toronto's production originated from **hard copy sources** (*i.e.*, file folders, off-site storage, etc): TOR_0000214 through TOR_0000223, TOR_0000812 through TOR_0015943, and TOR_0020201 through TOR_0021197.

Approximately 800 pages consist of printouts of expedited appointment calendars: TOR_0000001 through TOR_0000212 and TOR_0000234 through TOR_0000811. Another 4,257 pages were produced from email searches conducted by John Long: TOR_0015944 through TOR_0020200. None of those Bates-numbered pages, however, contain any stand-alone electronic documents. (TOR_0000213 is a contemporaneous letter detailing the

7

conclusion, the Opposition identifies a number of emails containing a shared NIV mailbox address to "prove" that the shared mailboxes were searched. Gov't Opp. at 25 & n.17. However, expert comparison of the referenced Bates-numbered documents with the corresponding native email files produced by the government demonstrates that these documents were collected from individual employees' mailboxes, not from shared NIV mailboxes as the Opposition asserts. *See* B. Harrison Supp. Decl. at ¶ 6. Any assertion to the contrary is either mistaken or misleading.[7] *See, e.g., Chapman*, 524 F.3d 1073.

Similarly, in Ms. Petrovich's first declaration she stated that "The *Information management staff* conducted the search of personal and hard drives *because they have access to all drives from the network server, not just shared drives*." Petrovich 1st Decl. at ¶ 7 (emphasis added). [Docket No. 115, Ex. 7] Ms. Petrovich's third declaration contradicts this statement, explaining that she actually conducted those searches and that "[a]ll responsive documents were provided". *See* Petrovich 3d Decl. at ¶ 4 [Docket No. 122, Ex. 4]. In fact, the government's productions contain no "stand-alone electronic documents" (*e.g.*, Word documents) from individual employees' hard drives. *See* B. Harrison Supp. Decl. at ¶ 5; *supra* note 6.[8]

Moreover, the government's new and contradictory assertion that Ms. Petrovich searched hard drives both manually and using the "My Computer" search utility (rather than

---

consulate's document search efforts—which indicates that the consulate only searched email, not other electronic data (**Ex. 2**).

The remaining ten, unaccounted-for pages consist of scanned print-outs of expedited appointment policies: TOR_0000214 through TOR_0000223. There is no where else that the shared mailbox emails or stand-alone electronic documents could exist.

[7] Mr. Long—the consulate's IT administrator—has stated that no shared mailboxes were searched. Moreover, the employee's Outlook folders on the native file disk correspond exactly with Ms. Petrovich's original declaration, but there are no corresponding folders for the shared mailboxes. *See* Petrovich 1st Decl. at ¶ 6 (emphasis added). [Docket No. 115, Ex. 7]. *See also* 5/29/07 J. Long Email [Docket No. 122, Ex. 11]; Defs' Mem. at 11-12 [Docket No. 115]; B. Harrison Supp. Decl., Attach. A.

[8] As explained *supra* note 7, only 10 pages of other "stand-alone electronic documents" were produced and those were located manually from the shared drive. *See* Petrovich 3d Decl. at ¶ 3 [Docket No. 122, Ex. 4]; *see also* Defs' Mem. at 21-24 & Ex. 12 (*i.e.*, footers indicate documents are from the shared W drive) [Docket No. 115].

having information technology personnel conduct the hard drive searches), even if true, would not improve the reliability of the consulate's searches. The "My Computer" search program is highly unreliable and would not have automatically searched the contents of electronic files (as opposed to merely searching the file names). *See* B. Harrison Supp. Decl. at ¶¶ 3, 5-6.

The rest of the government's arguments are similarly inapposite, misleading, or otherwise demonstrative of the unreliability of the consulate's representations to this Court. *See generally* B. Harrison Supp. Decl. at ¶¶ 3, 8. For instance, the government has no response to the fact that the Microsoft Outlook search utility could not have searched non-email documents, including attachments. *See* Gov't Opp. at 28; Defs' Mem. at 20 [Docket No. 115]. Likewise, the government fails to show that its email searches would have even come close to reasonably identifying all responsive materials. *See O'Keefe*, 2007 WL 1239204 at *3 (The government must "conduct[] thorough and complete searches of both hard copy files and electronic files, in a good faith effort to uncover all responsive information"). Indeed, the search phrases used by the government would not even have produced the results they expected. *See* B. Harrison Supp. Decl. at ¶¶ 3-4 ("expedite when put in quotes would not return a positive result for the keyword "expedited"). This would appear to explain why—to take one example—the government's searches only produced <u>eight</u> emails from Pat Haye's mailbox, despite the fact that Pat Haye plays a central role in administering the expedited appointment process. *See id*. at Attach. A.

In sum, not only does the government fail to provide any meaningful defense to the manner in which it conducted its electronic document searches, it continues to misrepresent the process and the search results to the Court and the defendants. *See id*. at ¶ 6, 8.

5. **Dismissal is Appropriate**

The government argues that dismissal of the indictment is inappropriate "even if the Court were to find that the government in some way failed to adequately preserve materials."

9

Gov't Opp. at 32. However, the government has not and cannot suggest any alternative remedy that would address the prejudice that has occurred because of its failure to preserve and produce the Court-ordered discovery. In this case, given the ongoing misrepresentations, any remedy short of dismissal would make a mockery of the United States' discovery obligations.

## II.    CONCLUSION

For all of these reasons, and the reasons in Defendants' Memorandum, defendants respectfully request that the Court hold that the government's noncompliance with the Court's orders, its loss and destruction of exculpatory evidence, and its misrepresentations to the Court have prevented defendants from having a meaningful opportunity to present a complete defense. Accordingly the Court should dismiss the Indictment with prejudice.

Dated: July 18, 2008                                         Respectfully submitted,


_____/s/_____
Thomas C. Green (D.C. Bar #14998)
Mark D. Hopson (D.C. Bar #394338)
David J. Ludlow (D.C. Bar #489136)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
*Counsel for Defendant Sunil Agrawal*

_____/s/_____

Bernard S. Grimm
COZEN O'CONNER
The Army and Navy Building
1627 I Street, N.W. Suite 1100
Washington, D.C. 20006
*Counsel for Defendant Michael John O'Keefe*