UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    v.<br><br>**MICHAEL JOHN O'KEEFE, SR. and SUNIL AGRAWAL,**<br><br>    **Defendants.** | Crim. No. 06-249 (PLF/JMF) |

## REPORT AND RECOMMENDATION

Before me for a Report and Recommendation is defendants' Joint Motion to Dismiss [#115]. For the reasons stated herein, I recommend that the defendants' motion be denied without prejudice insofar as it claims a violation of their constitutional right not to be deprived of their liberty without due process of law, but that an evidentiary hearing should be held on their claim that the government has violated Judge Friedman's discovery order of April 27, 2007. United States v. O'Keefe, No. 06-CR-2409, 2007 WL 1239204, at *4 (D.D.C. Apr. 27, 2007).

## BACKGROUND

The gravamen of the superseding indictment is that defendant Michael John O'Keefe, a consular officer in the U.S. Consulate in Toronto, Canada, accepted as bribes gifts from defendant Sunil Agrawal to expedite the visa applications of the employees of his company, STS Jewels, Inc. Id. at *1.

## DISCOVERY DISPUTES

By his order of April 27, 2007, Judge Friedman ordered that the following be produced or done:

1. Defendants' requests respecting applications submitted by or on behalf of STS Jewelers for expedited visa appointments, decisions granting or denying such interview requests and the grant or denial of the visas themselves. The government must search not only in Toronto but any other consulate in North America where such requests for expedited visa appointments, decisions granting or denying such interview requests, or decisions regarding visas are likely to be found.

2. All written rules, policies, procedures, and guidelines regarding the treatment of expedited visa applications appointments and visa application approvals as the above mentioned posts.

3. Because they may not be formalized, the government must also produce any memoranda, letters, emails, faxes and other correspondence prepared or received by any consular offices at these posts that reflect either policy or decisions in specific cases with respect to expediting.

4. Since it appears that employees below the level of consular officers—including even consulate secretaries and non-U.S. citizens employees—may approve requests for and schedule expedited visa appointments, their files must also be searched.

5. Statistical information regarding the number of requests for expedited visa interview appointments.

O'Keefe, 2007 WL 1239204, at *3-4.

Judge Friedman also ordered that a letter be sent to relevant consulate personnel instructing them to conduct a thorough and complete search designed to uncover the required documents. Id. at 4.

Defendants complain that the government has failed to fulfill its obligation and have moved to dismiss. Thus, two issues are presented: (1) whether the government has complied with the order Judge Friedman issued that required that the government conduct "thorough and complete searches of both hard copy and electronic files, in a good faith effort to uncover all

responsive information in its 'possession, custody or control'"[1] and (2) whether the government violated the defendants' constitutional rights not to be deprived of their liberty without due process of law by destroying evidence that would tend to exculpate them.

I must emphasize at the outset that both parties proceed upon the premise that the electronically stored information that was not produced by the government earlier is now gone, since no effort was made to preserve it. To that end, defendants do not seek to compel another search for that which the government claims is missing. Instead, the defendants contend that the only proper remedy for the situation is dismissal. The government, on the other hand, insists that it complied with the order and that the information not produced is neither material nor relevant to the defendants' guilt.

A.   Due Process Analysis

To establish a due process violation, pursuant to Arizona v. Youngblood, 488 U.S. 51 (1988) and California v. Trombetta, 467 U.S. 479, 488-89 (1984), the defendant must establish that the government failed in bad faith to preserve material and potentially exculpatory evidence. United States v. McKie, 951 F.2d 399, 404 (D.C. Cir. 1991). Materiality and bad faith are the critical elements. Unless both are shown, dismissal of the indictment would be inappropriate. See, e.g., Rogala v. District of Columbia, 161 F.3d 44, 56 (D.C. Cir. 1998); In re Sealed Case, 99 F.3d 1175, 1178 (D.C. Cir. 1995) (bad faith *sine qua non* to Youngblood claim; defendant must establish that police knew of the exculpatory nature of the evidence at the time it was lost or destroyed); United States v. Caicedo-Llanos, 960 F.2d 158, 160 (D.C. Cir. 1992) (to establish due process violation under either Brady v. Maryland, 373 U.S. 83, 87 (1963) or Youngblood, defendant must show that evidence not given him or destroyed was material to his defense).

---

[1] O'Keefe, 2007 WL 1239204, at *2.

Defendants' assertion of a violation of due process faces a difficult obstacle in establishing materiality and resulting prejudice. As explained above, since the government did not preserve the memories of the electronic storage devices from which it took the information that it made available to the defendants, it is now clear that it is impossible to retrieve any more information from those devices. Hence a second search using different keywords or more sophisticated searching techniques is not feasible.

While the loss of information cannot be remedied, I do not believe that the nature of the loss should lead to the dismissal of the indictment before trial. Judge Friedman explained the materiality of the discovery he ordered—the discovery of "any memoranda, letters, e-mails, faxes and other correspondence prepared or received by an consular officers at these posts that reflect either policy or decisions in specific cases with respect to expediting [visas]"[2]—as follows:

> Defendants argue that the discovery requested is "material" to the preparation of their defenses within the meaning of Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure- specifically, that there was no "official act" as a matter of law and that the defendants did not have the requisite criminal intent as a matter of fact. Defendants maintain that the requested discovery will show either that there was no established policy or procedure regarding expediting visa applications or that it was the routine practice to violate or disregard the policy. They say that nothing unorthodox happened in this case because visa applications were routinely expedited in consulates in Toronto and in other parts of Canada and Mexico, and that expediting was so routine that the decision whether to expedite was delegated even to non-official, clerical personnel. Obtaining documents through discovery to show these facts, defendants maintain, will undercut any evidence offered by the government concerning the formality of the process as suggested by the indictment. Defendant Agrawal does not deny that he gave gifts to defendant O'Keefe, but maintains that the gifts were given out of friendship and not as a quid pro quo; the routine nature of the expedition process, he argues, supports this defense

---

[2] O'Keefe, 2007 WL 1239204, at *3.

4

> and will undercut the government's ability at trial to show corrupt
> or otherwise criminal intent.

O'Keefe, 2007 WL 1239204, at *1.

Thus, to be relevant the lost information can only be of two types. On the one hand, it might show that the granting of expedited visa appointments was so routine and done by so many different people, some of whom were not even citizens, that it did not rise to an official act under the bribery statute, and was so ordinary that Agrawal would not have been so foolish to bribe O'Keefe to do what would have been done in any event by anyone who worked at the consulate. This would fortify the defense contention that Agrawal gave the gifts to O'Keefe out of personal friendship rather than corruptly and with the intent to induce O'Keefe's performance of an official act in Agrawal's favor.

On the other hand, the lost evidence might show the contrary, that the granting of expedited visa appointments was extraordinary, rendering the evidence inculpatory. If there was a long line of applicants waiting, and the expediting of appointments was not done in the ordinary course, it would give Agrawal a motive to bribe O'Keefe.

But, we are not dealing with a situation where the only evidence that would support the defense's contention is gone. To the contrary, according to the defendants, the government has produced so much information that it had to change the theory of the indictment.[3] Additionally,

---

[3] "As the evidence regarding the routine and unofficial nature of the expedited appointment process started to trickle out and undermine the bribery theory of the original Indictment, the United States responded by returning a superseding indictment which has broadened the theory of the case by alleging that both the expedited appointments and the issuance of the visas themselves were the subject of the alleged bribes . . . The action of the United States in returning a superseding indictment—and effectively abandoning the theory that Mr. O'Keefe was bribed by Mr. Agrawal to expedite appointment—is indisputable evidence that the discovery sought was not only exculpatory, but powerful." Memorandum of Points and Authorities In Support of Defendants' Joint Motion to Dismiss ("Mot.") at 33. See also Reply to Government's Opposition to Defendants' Joint Motion to Dismiss ("Reply") at 3 ("The documents that were located and produced completely undermined the government's original theory of the case—that the expedited visa *appointments* granted by Mr. O'Keefe were somehow contrary to State Department Policy or "written" appointment procedures.").

"the government has offered to stipulate to the fact that consular officials exercising great discretion in granting or denying expedited visa appointments, that receiving an expedited visa appointment is a common occurrence, and that people frequently receive expedited visa appointments without providing anything of value to the interviewing official." Government's Opposition to Defendants' Motion to Dismiss ("Opp.") at 18.

Thus, the real question is not whether material evidence has been lost but whether, given the evidence that has been produced, evidence that supports the defendants' theory of the case, combined with the stipulations the government will make, permits a court to nevertheless conclude that the lost evidence is still so material to the defendants' case that under the demanding test of materiality[4] used to assess a violation of the due process clause, a dismissal of the indictment is appropriate. In other words, the difference is at the margin—the issue is whether the lost evidence would have made a difference given all the other similar evidence that expediting visa appointments was ordinary and done in the regular course, rather than unusual, let alone unique .

In my view, it is improvident to make that decision now and grant defendants dismissal of the indictment before the trial. As Judge Friedman himself has pointed out, assessing the prejudice to the defendant from the loss of potentially exculpatory evidence prior to trial can be tricky. In United States v. Safavian, 233 F.R.D. 12 (D.D.C. 2005), Judge Friedman warned against prosecutors using an outcome determinative test to assess the materiality of a disclosure before the trial begins. Judge Friedman stated:

---

[4] "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see United States v. Agurs, 427 U.S. at 109-110, 96 S.Ct. at 2400, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. at 489 (footnote omitted).

6

> The government acknowledges that under <u>Brady</u> it has the affirmative duty to produce exculpatory evidence when such evidence is material to either guilt or punishment. But it contends that evidence is "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).  The problem with this iteration of *Brady* and the government's view of its obligations at this stage of the proceedings, however, is that it permits prosecutors to withhold admittedly favorable evidence whenever the prosecutors, in their wisdom, conclude that it would not make a difference to the outcome of the trial. Most prosecutors are neither neutral (nor should they be) nor prescient, and any such judgment necessarily is speculative on so many matters that simply are unknown and unknowable before trial begins: which government witnesses will be available for trial, how they will testify and be evaluated by the jury, which objections to testimony and evidence the trial judge will sustain and which he will overrule, what the nature of the defense will be, what witnesses and evidence will support that defense, what instructions the Court ultimately will give, what questions the jury may pose during deliberations (and how they may be answered), and whether the jury finds guilt on all counts or only on some (and which ones).

<u>Id.</u> at 16.

     I reached the identical conclusion when I was confronted with the loss of evidence by the government in a civil case where a party claimed that the loss in itself justified dismissal of the complaint.  Like Judge Friedman, I insisted that an accurate assessment of the significance of the loss could be made only after the trial evidence was assessed and analyzed.  I stated:

> In my view, in this complicated case, whether alternatives short of dismissal will suffice can only be determined after the court has heard the trial testimony. Only then can a conscientious determination be made as to the significance of the evidence that is gone; only the trial evidence will establish whether that loss is insignificant or so significant that dismissal is warranted, even though there are other alternatives such as precluding the government from introducing certain evidence, advancing a certain argument, or instructing the jury that it may draw an adverse inference.

7

Miller v. Holzmann, No. 95-CIV-1231, 2007 WL 172327, at *7 (D.D.C. Jan. 17, 2007)[5]

Identically here, the significance of the loss of the evidence can only be accurately assessed when the government rests and then when both sides rest.  At that point, the lost evidence may prove to be crucial to the jury reaching a fair verdict or may prove to be cumulative.  Hence, a determination that the demanding standard of Youngblood and Trombetta has or has not been met should be made at the trial.  I recommend that the motion to dismiss the indictment be denied without prejudice to the defendants' right to argue at trial that the loss of the evidence denied them a fair trial and the case should therefore not be submitted to the jury.

B.      Rule 16

Rule 16 of the Federal Rules of Criminal Procedure provides the court with power to impose specific requirements or prohibitions for failure to comply with an order issued under that Rule and also provides the court with power to "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D).

The nature of the sanction is a more nuanced inquiry.  The Advisory Committee Note to the 1966 amendment, which granted the court its discretionary power to sanction a violation of a discovery order, states the following of that power:

> The second sentence gives wide discretion to the court in dealing with the failure of either party to comply with a discovery order. Such discretion will permit the court to consider the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and other relevant circumstances.

Fed. R. Crim. P. 16 advisory committee's note (1966).  Accord United States v. Hastings, 126 F.3d 310, 317 (4th Cir. 1997), cert. denied, 523 U.S. 1060 (1998) ("In determining a suitable and

---

[5] The government appears to agree.  See, e.g., Opp. at 16 n.11 ("Because the Court cannot possibly say for certain whether the documents at issue were exculpatory, let alone that they would influence a jury verdict at trial, it is impossible to decide whether there has been a Brady violation at this time.").

8

effective sanction, a court must weigh the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government.").

It is clear, however, that the court must impose "'the least severe sanction that will accomplish the desired—prompt and full compliance with the court's discovery orders.'" United States v. Marshall, 132 F.3d 63, 69 (D.C. Cir. 1998) (quoting United States v. Sarcinelli, 667 F.2d 5, 7 (5th Cir. 1982)).

C.   Analysis

It is first clear that, as I have explained, the loss of the evidence cannot be remedied; the evidence is gone. Second, as I have also explained, the materiality of the lost evidence should only be assessed after the evidence is presented at trial. That leaves consideration of what the government did or failed to do to comply with Judge Friedman's order.

The defendants' complaints range along a continuum from differences as to methodology to more serious complaints that the government official primarily responsible for the search, Peggy L. Petrovich, the Visa Unit Chief at the United States Consulate General in Toronto, misled the court and that her statements about the scope and efficacy of the search are contradicted by incontrovertible physical evidence.

For the reasons now to be stated, I believe that a hearing must be held to explore the validity of these complaints.

    1.   Differences in Methodology

        a.   The CIF

9

Defendants complain that the Department of Justice and the Department of State did not deploy a specific unit of the Department of State that specializes in forensic searching, the Computer Investigations and Forensics Branch ("CIF") of the State Diplomatic Security Service, to the six consulates where the searches were conducted. Mot. at 28.  The government counters that such a deployment was impractical. Opp. at 30.

While Judge Friedman indicated that he had no desire to micro-manage the search, it is also true that the manner in which this search was conducted was inconsistent with the way such searches would be conducted by a law enforcement unit that specializes in the forensic searching of computers.  Such a unit would likely have considered making an image of the computers at issue, *i.e.* a perfect duplication of the computer's memory.  I know this to be a fact because the government seeks the authority to make such images in the search warrant applications it makes to me when it desires to search the memory of a computer.  Indeed, the Department of Justice indicates to law enforcement agents that the following language should be inserted in an application for a search warrant to search a computer if the applying agent believes that the magistrate judge might balk at removing all the computers to be searched from an ongoing business:

> The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store [the computer files described in the warrant]. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for [the computer files described in the warrant] from the image copy at a later date.

U. S. Dep't of Justice, Computer Crime and Intellectual Property Section, Criminal Division, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, http://www.cybercrime.gov/s&smanual2002.htm#_IIB1_(last visited August 13, 2008).

Additionally, imaging a computer's memory is neither outrageously expensive nor time consuming at the present state of the technology. See Citizens for Responsibility and Ethics in Wash. v. Executive Office of the President, Nos. 07-CV-1707, 07-CV-1577, 2008 WL 2932173, at *3 (D.D.C. July 29, 2008) (expert witness estimated that the "typical cost of forensic imaging a 100 GB hard drive is between $400 and $1,000 and it takes approximately two to three hours to complete the imaging."). Thus, there was unquestionably available to the Department of Justice a scientific methodology that it uses when it is searching for evidence of crime, which it chose not to use here. While it cannot be said that the government's failure to use the most up to date technology is itself a violation of Judge Friedman's order, it has to be said that had the government used the CIF to do the search and had the CIF used the common technique of imaging the memories of the computers at issue, there would be no controversy about the government's search. Were there images of the computers at issue, all the Court need do is to order an additional search for data that it is convinced the government should produce. Now that the data is gone, that capability is gone and its loss surely should weigh against the government. At a minimum, a hearing should explore whether imaging was as practical as I believe it was.

      b.    <u>Keywords</u>

In accordance with Judge Friedman's explicit direction, the government and the defendants attempted to agree on the keywords that would be used to search the memories of the computers at issue. Whatever the nature of that agreement, defendants protest that the keywords that were used must have failed to disclose a large number of the pertinent documents. Mot. at 21-27. In support of that contention, they submit the declaration of Brett D. Harrison, who explains why this is so. The government does not counter that evidence with a similar declaration of its own but insists that the keywords it used were adequate and that it is

speculative to conclude that the use of other keywords or additional ones would have produced more documents.

As I have pointed out in this very case, whether the keywords used will in fact produce what is sought by the person using them is a topic on which opinion testimony by a qualified person may be necessary. United States v. O'Keefe, 537 F. Supp. 2d 14, 23-24 (D.D.C. 2008). Accord Victor Stanley, Inc. v. Creative Pipe, Inc., No. 06-CV-2662, 2008 WL 2221841, at *5 (D. Md. May 29, 2008). In my view, a hearing is necessary to first explore whether the expression of such an opinion is consistent with the standards of Rule 703 of the Federal Rules of Evidence and, if it is, whether it is meritorious.

2. Accusations of Perjury

Defendants also accuse Petrovich of filing misleading and perjurious declarations in justifying the search that was done. Specifically, defendants claim:

   a. Petrovich's assertion that she conducted or directed a search for information in shared mailboxes is contradicted by her fellow employee, John Long, who admitted that he never searched any of the shared mailboxes. In any event, the government's production does not contain any e-mails from shared mailboxes and defendants can establish by incontrovertible physical evidence that the emails given the defendants could not have come from shared mailboxes.

   b. In addition to emails, defendants sought "stand alone" documents, i.e. documents produced by word processing or other software but, despite Petrovich's assertion that she searched for stand alone documents, the government produced none and Long stated that he was never directed to search for stand-alone documents.

   c. Petrovich's assertion that she searched, using keywords, for stand alone documents and that the only responsive stand alone documents were the Standard Operating Procedures and NIV Schedule Calendar that were produced in hard copy is false. It is impossible for these documents to have been discovered by the use of key words because none

12

>   contained any of the search terms that were used to locate the electronically stored information.
>
> d.  Petrovich's assertion that the search included shared drives, personal drives, and hard drives is contradicted by Long who said that he did not search those drives.[6]

See Mot. at 9-12; Reply at 7-9.

The government counters each of these claims but the trading of accusations and responses by counsel is no substitute for an evidentiary hearing at which witnesses testify under oath subject to cross examination. Certainly, the accusations of misstatements to the Court are serious enough to warrant such a hearing.

## CONCLUSION

---

[6] Note that an employee could have archived email in a .pst account, and defendants claim that if the hard drive of each computer was not searched, emails archived to .pst accounts would not be discovered. I recently stated:

> It is common practice for a user to move e-mails from his inbox to a personal folder. The motive for such action may involve, for example, that user's personal method of organization (i.e. the user moves all messages relating to "Project A" to a personal folder labeled "Project A e-mails," making them easier to locate at a later date), or an attempt to reduce the size of the user's inbox while preserving e-mails (networks often impose "quotas" which serve as limitations on the size of each user's inbox; as a user's inbox approaches that quota, that user is instructed to delete e-mails or move them to personal folders; if the user exceeds the quota, his ability to send and receive e-mail is suspended). When a user moves an e-mail to a personal folder, that e-mail is likely transferred from the network to a .PST file on that user's hard drive. It would remain there until deleted or destroyed, and would likely survive the replacement of the user's workstation. Second Decl. at ¶ 4 ("[I]f a user saved .pst files in their profile, those .pst files should be copied over."). It is possible, then, that an individual who was employed at EOP at any point between March 2003 and October 2005, and who remains employed at EOP, would have e-mails from that time period on his or her workstation

Citizens for Responsibility and Ethics in Wash. v. Executive Office of the President, et al., No. 07-1707, Memorandum Opinion, April 24, 2008 [#67], slip op. at 4-5. See Citizens for Responsibility and Ethics in Wash. v. Executive Office of the President, et al., No. 07-1707, 2008 WL 2932173, at *2 ("Consider the following scenario . . . an employee receives an e-mail; one week later, the employee moves that e-mail to a personal folder. That e-mail would not be present on any back-up tape currently being preserved, though it may still be present on that employee's workstation. [T]his scenario is not far-fetched; to the contrary, it is common practice for employees to move e-mails to personal folders.").

13

I therefore recommend that (1) defendants' motion be denied insofar as it claims a violation of due process of law, and (2) that a hearing be held before me on defendants' contention that the government failed to comply with Judge Friedman's discovery order, warranting the imposition of sanctions.

**Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140 (1985).**

_____/S/_____
JOHN M. FACCIOLA
Dated: August 19, 2008                                         UNITED STATES MAGISTRATE JUDGE